**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JACKSON ROSS-PILKINGTON, DONTA GONZALEZ, and SEBASTIAN DITTGEN, individually and on behalf of all others similarly situated,<br><br>PLAINTIFFS,<br><br>v.<br><br>OURBUS, INC.,<br><br>DEFENDANT. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jackson Ross-Pilkington, Donta Gonzalez and Sebastian Dittgen ("Plaintiffs"), individually and on behalf of all others similarly situated, allege as follows based on personal knowledge as to themselves, on the investigation of counsel, and on information and belief as to all other matters.

## NATURE OF THE ACTION

1. Plaintiffs bring this Class Action Complaint against OurBus, Inc., (hereinafter "OurBus" or "Defendant") for its use of "bait-and-switch" tactics that mislead consumers about the true price of tickets that Defendant sells to lure consumers into paying higher prices than they otherwise would.

2. OurBus is a nationwide intercity transportation company that operates scheduled motorcoach service across multiple regions of the United States, including high-volume service to and from the Washington, D.C. metropolitan area.

3. OurBus's service is marketed to and used by consumers throughout the Washington, D.C.–Virginia–Maryland region, including consumers who depart from locations in

or near the District of Columbia and Northern Virginia. As a result, OurBus's ticket sales and pricing practices affect substantial numbers of consumers in both the District of Columbia and Virginia.

4. OurBus operates and controls the website www.ourbus.com through which it sells tickets to consumers. The advertised price for each ticket sold by OurBus excludes unavoidable hidden charges which apply to all transactions.

5. Defendant unlawfully advertises and displays ticket prices on its website without including all mandatory fees or charges that customers must ultimately pay. Defendant uses a deceptively low initial price to lure consumers into the purchase process—the "bait." Then, after the consumer has relied on that low advertised price and decided to buy, Defendant adds hidden fees—the "switch."

6. In other words, Defendant conceals its mandatory fees until after consumers have invested time selecting a route, a date and time of departure, and have committed to purchasing based on the incomplete, deceptively low advertised price. Each stage of Defendant's checkout process is designed to increase consumer commitment so that, by the time the hidden fees are revealed, consumers—having already expended time and effort—are more likely to complete the transaction.

7. Accordingly, Plaintiffs bring this action individually and on behalf of all similarly situated consumers who purchased tickets from Defendant's website during the relevant statutory periods. Based on Defendant's unlawful conduct Plaintiffs seek damages, restitution, and reasonable attorneys' fees and costs for violations of Virginia's All-In Pricing Law, Va. Code Ann. § 59.1-608, the Virginia Consumer Protection Act (VCPA), Va. Code Ann. § 59.1-196 *et seq*., and the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq*.

## JURISDICTION, VENUE, AND CHOICE OF LAW

8. The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332. The putative class exceeds 100 members, the amount in controversy exceeds $5,000,000,[1] and at least one class member is a citizen of a state different from the Defendant.

9. The Court has personal jurisdiction over the Defendant because its principal place of business is in this District.

10. Venue is proper in this Court because Defendant resides in this District and a substantial portion of the occurrences and wrongdoing complained of herein occurred in this District.

11. District of Columbia law governs the Washington, D.C.-centered transactions at issue as to Plaintiffs Ross-Pilkington and Gonzalez and the D.C. Class. The District of Columbia has a materially greater interest in applying the CPPA to those claims because the transactions involved D.C. consumers who viewed Defendant's advertised prices, selected tickets, entered payment information, submitted their purchases, and suffered economic injury while physically located in the District of Columbia. The CPPA specifically protects consumers' right to truthful information about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia. Applying any New York choice-of-law provision in Defendant's Terms to bar those claims would improperly displace the District's statutory protections for D.C. consumers and Washington, D.C.-centered transactions.

12. Virginia law governs the Virginia-centered transactions at issue as to Plaintiff Dittgen and the Virginia Classes. Virginia has a materially greater interest in applying its consumer-protection statutes to those claims because the transactions involved Virginia

[1] On information and belief, the Defendant has sold several thousands of tickets to members of the putative classes during the statutory period.

consumers who viewed Defendant's advertised prices, selected tickets, entered payment information, submitted their purchases, and suffered economic injury while physically located in Virginia. The VCPA is remedial legislation intended to promote fair and ethical dealings between suppliers and the consuming public. Separately, Virginia's All-In Pricing Law specifically regulates the challenged drip-pricing practice by requiring suppliers to clearly and conspicuously display the total price, including all mandatory fees or surcharges. Applying any New York choice-of-law provision in Defendant's Terms to bar those claims would improperly displace Virginia's statutory protections for Virginia consumers and Virginia-centered transactions.

## PARTIES

13. Plaintiff **Jackson Ross-Pilkington** is a natural person and a resident of the District of Columbia.

14. In October of 2025, while physically located in the District of Columbia, Plaintiff Ross-Pilkington purchased a bus ticket from Defendant's website.

15. During this transaction, Plaintiff Ross-Pilkington was first presented with a screen allowing him to input his itinerary details, including arrival and departure locations, date of travel, and number of passengers.

16. From there, Plaintiff Ross-Pilkington was brought to another screen which quoted several departure times on the chosen date and quoted a specific price for each prospective departure.

17. Plaintiff Ross-Pilkington was prompted to press a button to pick his desired departure time at a specific quoted price.

18. Only after Plaintiff Ross-Pilkington selected tickets for a specific route, date, and departure time, saw a quoted ticket price, and chose to proceed based on that quoted price was he shown additional mandatory charges.

19. Those mandatory charges were labeled “Facility Fee,” “Booking Fee,” and “Fuel Surcharge.” Plaintiff Ross-Pilkington paid these mandatory charges as part of the purchase price.

20. Defendant advertised and displayed a ticket price that did not clearly and conspicuously include the total price of the tickets.

21. Instead, Defendant charged Plaintiff Ross-Pilkington mandatory fees and surcharges that were not included in the ticket price Defendant initially advertised or displayed.

22. Plaintiff Ross-Pilkington was unaware of these mandatory fees and surcharges when he selected his itinerary and chose tickets based on the quoted price.

23. The deceptively low, initially advertised price was a substantial factor in Plaintiff Ross-Pilkington’s decision to purchase the tickets. As a direct result of Defendant’s pricing practice, Plaintiff Ross-Pilkington paid more than the price Defendant initially displayed—specifically, Plaintiff Ross-Pilkington paid the mandatory ‘Facility Fee,’ ‘Booking Fee,’ and ‘Fuel Surcharge’ in addition to the advertised ticket price. Had Defendant disclosed the full mandatory price, including the additional fees, at the first price display, Plaintiff Ross-Pilkington would not have completed the purchase at the higher total price later imposed in the purchase flow.

24. Defendant lured Plaintiff Ross-Pilkington in with deceptively low initial prices, cultivating purchasing commitment based on that initial price. Defendant’s purchase flow was designed to cultivate commitment to the transaction before disclosing mandatory fees, thereby dissuading comparison shopping and increasing the conversion rate of Defendant’s website.

25. Defendant intentionally did not include the additional fees in the displayed and advertised prices of the tickets and only disclosed them once Plaintiff Ross-Pilkington (and indeed all purchasers of tickets from Defendant's website) had spent time and mental energy selecting tickets, thereby increasing the likelihood that Plaintiff Ross-Pilkington and those similarly situated would complete the purchase notwithstanding the higher total price.

26. Defendant did not disclose the true all-in mandatory price when Plaintiff Ross-Pilkington made the key decision to select tickets and proceed through the transaction. Instead, Defendant withheld the additional hidden fees until the final stages of the purchase flow, after Plaintiff Ross-Pilkington had already selected tickets, chosen a date and time, and invested time and effort in the transaction based on a lower, incomplete price. Once confronted with the newly disclosed mandatory fee, Plaintiff Ross-Pilkington was forced either to abandon the transaction after expending time and effort in reliance on the lower, incomplete price or to complete the purchase by paying the higher total price Defendant had withheld until the end. Under those circumstances, Plaintiff Ross-Pilkington's payment of the hidden fees was not the product of a fully informed or truly voluntary choice but was extracted through a purchase flow designed to induce consumers to proceed despite the higher total price.

27. Plaintiff Ross-Pilkington expects to purchase intercity bus services again in the future. Both price and value will factor significantly into Plaintiff Ross-Pilkington's purchasing decision and OurBus is one of the small number of local options that Plaintiff Ross-Pilkington may consider. Accordingly, absent injunctive relief, Plaintiff Ross-Pilkington faces a real and immediate risk of being misled again.

28. Defendant intentionally excluded these mandatory fees from the displayed and advertised ticket prices and disclosed them only after Plaintiff Ross-Pilkington—and all other

consumers purchasing tickets through Defendant's website—had invested significant time and effort selecting tickets, thereby increasing the likelihood that Plaintiff Ross-Pilkington would complete the purchase notwithstanding the higher total price.

29. Plaintiff **Donta Gonzalez** is a natural person and a resident of the District of Columbia.

30. On or about September of 2025, while physically located in the District of Columbia, Plaintiff Gonzalez purchased a bus ticket from Defendant's website.

31. During this transaction, Plaintiff Gonzalez was first presented with a screen allowing him to input his itinerary details, including arrival and departure locations, date of travel, and number of passengers.

32. From there, Plaintiff Gonzalez was brought to another screen which quoted several departure times on the chosen date and quoted a specific price for each prospective departure.

33. Plaintiff Gonzalez was prompted to press a button to pick his desired departure time at a specific quoted price.

34. Only after Plaintiff Gonzalez selected tickets for a specific route, date, and departure time, saw a quoted ticket price, and chose to proceed based on that quoted price was he shown additional mandatory charges.

35. Those mandatory charges were labeled "Facility Fee," "Booking Fee," and "Fuel Surcharge." Plaintiff Gonzalez paid these mandatory charges as part of the purchase price.

36. Defendant advertised and displayed a ticket price that did not clearly and conspicuously include the total price of the tickets.

37. Instead, Defendant charged Plaintiff Gonzalez mandatory fees and surcharges that were not included in the ticket price Defendant initially advertised or displayed.

38. Plaintiff Gonzalez was unaware of these mandatory fees and surcharges when he selected his itinerary and chose tickets based on the quoted price.

39. The deceptively low, initially advertised price was a substantial factor in Plaintiff Gonzalez's decision to purchase the tickets. As a direct result of Defendant's pricing practice, Plaintiff Gonzalez paid more than the price Defendant initially displayed—specifically, Plaintiff Gonzalez paid the mandatory 'Facility Fee,' 'Booking Fee,' and 'Fuel Surcharge' in addition to the advertised ticket price. Had Defendant disclosed the full mandatory price, including the additional fees, at the first price display, Plaintiff Gonzalez would not have completed the purchase at the higher total price later imposed in the purchase flow.

40. Defendant lured Plaintiff Gonzalez in with deceptively low initial prices, cultivating purchasing commitment based on that initial price. Defendant's purchase flow was designed to cultivate commitment to the transaction before disclosing mandatory fees, thereby dissuading comparison shopping and increasing the conversion rate of Defendant's website.

41. Defendant intentionally did not include the additional fees in the displayed and advertised prices of the tickets and only disclosed them once Plaintiff Gonzalez (and indeed all purchasers of tickets from Defendant's website) had spent time and mental energy selecting tickets, thereby increasing the likelihood that Plaintiff Gonzalez and those similarly situated would complete the purchase notwithstanding the higher total price.

42. Defendant did not disclose the true all-in mandatory price when Plaintiff Gonzalez made the key decision to select tickets and proceed through the transaction. Instead, Defendant withheld the additional hidden fees until the final stages of the purchase flow, after Plaintiff Gonzalez had already selected tickets, chosen a date and time, and invested time and effort in the transaction based on a lower, incomplete price. Once confronted with the newly disclosed

mandatory fee, Plaintiff Gonzalez was forced either to abandon the transaction after expending time and effort in reliance on the lower, incomplete price or to complete the purchase by paying the higher total price Defendant had withheld until the end. Under those circumstances, Plaintiff Gonzalez's payment of the hidden fees was not the product of a fully informed or truly voluntary choice but was extracted through a purchase flow designed to induce consumers to proceed despite the higher total price.

43. Plaintiff Gonzalez expects to purchase intercity bus services again in the future. Both price and value will factor significantly into Plaintiff Gonzalez's purchasing decision and OurBus is one of the small number of local options that Plaintiff Gonzalez may consider. Accordingly, absent injunctive relief, Plaintiff Gonzalez faces a real and immediate risk of being misled again.

44. Defendant intentionally excluded these mandatory fees from the displayed and advertised ticket prices and disclosed them only after Plaintiff Gonzalez—and all other consumers purchasing tickets through Defendant's website—had invested significant time and effort selecting tickets, thereby increasing the likelihood that Plaintiff Gonzalez would complete the purchase notwithstanding the higher total price.

45. Plaintiff **Sebastian Dittgen** is a natural person and a resident of Virginia.

46. On or about October of 2025, while physically located in Virginia, Plaintiff Dittgen purchased bus tickets from Defendant's website.

47. During this transaction, Plaintiff Dittgen was first presented with a screen allowing him to input his itinerary details, including arrival and departure locations, date of travel, and number of passengers.

48. From there, Plaintiff Dittgen was brought to another screen which quoted several departure times on the chosen date and quoted a specific price for each prospective departure.

49. Plaintiff Dittgen was prompted to press a button to pick his desired departure time at a specific quoted price.

50. Only after Plaintiff Dittgen selected tickets for a specific route, date, and departure time, saw a quoted ticket price, and chose to proceed based on that quoted price was he shown additional mandatory charges.

51. Those mandatory charges were labeled “Facility Fee,” “Booking Fee,” and “Fuel Surcharge.” Plaintiff Dittgen paid these mandatory charges as part of the purchase price.

52. Defendant advertised and displayed a ticket price that did not clearly and conspicuously include the total price of the tickets.

53. Instead, Defendant charged Plaintiff Dittgen mandatory fees and surcharges that were not included in the ticket price Defendant initially advertised or displayed.

54. Plaintiff Dittgen was unaware of these mandatory fees and surcharges when he selected his itinerary and chose tickets based on the quoted price.

55. The deceptively low, initially advertised price was a substantial factor in Plaintiff Dittgen’s decision to purchase the tickets. As a direct result of Defendant’s pricing practice, Plaintiff Dittgen paid more than the price Defendant initially displayed—specifically, Plaintiff Dittgen paid the mandatory ‘Facility Fee,’ ‘Booking Fee,’ and ‘Fuel Surcharge’ in addition to the advertised ticket price. Had Defendant disclosed the full mandatory price, including the additional fees, at the first price display, Plaintiff Dittgen would not have completed the purchase at the higher total price later imposed in the purchase flow.

56. Defendant lured Plaintiff Dittgen in with deceptively low initial prices, cultivating purchasing commitment based on that initial price. Defendant's purchase flow was designed to cultivate commitment to the transaction before disclosing mandatory fees, thereby dissuading comparison shopping and increasing the conversion rate of Defendant's website.

57. Defendant intentionally did not include the additional fees in the displayed and advertised prices of the tickets and only disclosed them once Plaintiff Dittgen (and indeed all purchasers of tickets from Defendant's website) had spent time and mental energy selecting tickets, thereby increasing the likelihood that Plaintiff Dittgen and those similarly situated would complete the purchase notwithstanding the higher total price.

58. Defendant did not disclose the true all-in mandatory price when Plaintiff Dittgen made the key decision to select tickets and proceed through the transaction. Instead, Defendant withheld the additional hidden fees until the final stages of the purchase flow, after Plaintiff Dittgen had already selected tickets, chosen a date and time, and invested time and effort in the transaction based on a lower, incomplete price. Once confronted with the newly disclosed mandatory fee, Plaintiff Dittgen was forced either to abandon the transaction after expending time and effort in reliance on the lower, incomplete price or to complete the purchase by paying the higher total price Defendant had withheld until the end. Under those circumstances, Plaintiff Dittgen's payment of the hidden fees was not the product of a fully informed or truly voluntary choice but was extracted through a purchase flow designed to induce consumers to proceed despite the higher total price.

59. Plaintiff Dittgen expects to purchase intercity bus services again in the future. Both price and value will factor significantly into Plaintiff Dittgen's purchasing decision and OurBus

is one of the small number of local options that Plaintiff Dittgen may consider. Accordingly, absent injunctive relief, Plaintiff Dittgen faces a real and immediate risk of being misled again.

60. Defendant intentionally excluded these mandatory fees from the displayed and advertised ticket prices and disclosed them only after Plaintiff Dittgen—and all other consumers purchasing tickets through Defendant's website—had invested significant time and effort selecting tickets, thereby increasing the likelihood that Plaintiff Dittgen would complete the purchase notwithstanding the higher total price.

61. Defendant OurBus, Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.

## DRIP PRICING AND LATE DISCLOSED HIDDEN FEES ARE DECEPTIVE, UNFAIR, ANTI-CONSUMER AND ANTI-COMPETITIVE

62. Drip pricing is a bait and switch pricing technique "in which firms advertise only part of a product's price and reveal other charges later as the customer goes through the buying process."[2] In a drip pricing scheme mandatory fees — like those charged by Defendant — are foisted upon consumers after they have been lured in by a misleadingly low advertised price. These surprise fees have been dubbed "junk fees" by the Federal Trade Commission ("FTC").[3] Bait-and-switch junk-fee markups are particularly widespread amongst online ticketing

[2] Trade Regulation Rule on Unfair or Deceptive Fees, Fed. Trade Comm'n (Jan. 2025), available at https://www.federalregister.gov/documents/2025/01/10/2024-30293/trade-regulation-rule-on-unfair-or-deceptive-fees

[3] The FTC classifies "junk fees" as "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer including goods or services that consumers would reasonably assume to be included within the overall advertised price" or fees that are "hidden," such as those "disclosed only at a later stage in the consumer's purchasing process or not at all." Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (codified at 16 C.F.R. pt. 464).

platforms. Research shows that consumers ambushed by hidden fees at checkout pay upward of twenty percent more than when the actual price was disclosed upfront.[4]

63. It is estimated that junk fees cost Americans over $90 billion each year.[5] Research has shown that consumers who are not provided the complete price until checkout are likely to proceed with their purchase even after the junk fee is revealed because they have already factored the deceptively low price into their decision and built purchasing commitment as they clicked through the transaction.

64. Research shows that consumers place stock in initial prices and tend to proceed with transactions even after exorbitant and unpredictable fees have been added despite their better judgment—despite the fact that continuing to search for cheaper prices would be more "optimal"—because consumers want to avoid "the cost of the time and cognitive effort involved" in continuing to search for a product or service.[6] Once consumers decide what to buy, they are unlikely to depart from that decision because of the "additional cognitive effort" involved in resuming their search.[7] Indeed, as companies that engage in junk fee practices are aware, consumers choose products or services based on the advertised "base price," and not based on the

---

[4] Morgan Foy, University of California-Berkeley, Haas School of Business, "Buyer Beware: Massive Experiment Shows Why Ticket Sellers Hit You with Last Second Fees" (Feb. 9, 2021), https://newsroom.haas.berkeley.edu/research/buyerbeware-massive-experiment-shows-why-ticketsellers-hit-you-with-hidden-fees-drip-pricing/ (concluding that consumer expenditure on tickets increased 21% when true price not disclosed initially).

[5] https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2024/04/24/readout-of-white-house-state-legislators-convening-on-junk-fees/

[6] Mary W. Sullivan, Economic Issues: Economic Analysis of Hotel Resort Fees, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16–17, https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf

[7] *Id.* at 17.

price inclusive of fees, which is obscured by partitions in the purchase flow.[8] In fact, studies show that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[9]

65. The FTC's Bureau of Economics has found that consumers are harmed by drip pricing because they are forced "either to incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly [transaction], or both."[10]

66. The FTC has characterized junk fees as especially harmful when they are hidden (i.e., disclosed only at a later stage in the purchasing process), because openly disclosed junk fees enable consumers to immediately determine that the cost of an item is not favorable relative to the cost charged by competitors and choose to do business elsewhere. As a result, the product or service listed by bad actors like the Defendant appears cheaper to consumers than competitors' products or services, even though the total cost of the product or service, inclusive of junk fees, is equally, if not more, expensive than those other companies' products or services.

67. Adding hidden junk fees after securing purchase commitment also generates significant burden for individual consumers, who, when confronted with drip pricing "pay upward

---

[8] Alexander Rasch et al., Drip Pricing & Its Regulation: Experimental Evidence, 176 J. Econ. Behavior & Org. 353 (2020), available at https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189?via%3Dihub (In controlled experiment, buyers "based their purchase decision exclusively on the base price."). *See also id. (*"buyers may be hurt" because "[w]hen there is uncertainty over possible drip prices . . . consumers more frequently fail to identify the cheapest offer."*)*

[9] Shelle Santana et al., (2020) Consumer Reactions to Drip Pricing. Marketing Science 39(1):188-210. https://doi.org/10.1287/mksc.2019.1207

[10] Mary W. Sullivan, Economic Issues: Economic Analysis of Hotel Resort Fees, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16–17, https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf

of twenty percent more than when the actual price was disclosed upfront."[11] By concealing the actual price of tickets, sellers like Defendant force consumers to spend "additional time" comparison shopping for tickets than they otherwise would which represents a cognizable injury.[12]

68. In sum, bait-and-switch hidden fee tactics are bad for markets and bad for consumers.

**<u>THE DISTRICT OF COLUMBIA'S CPPA PROHIBITS DRIP PRICING</u>**

69. The D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq*. protects consumers in the District of Columbia against false, deceptive, or unfair business practices. It is a broad consumer protection statute, meant to "assure that a just mechanism exists to remedy all improper trade practices." D.C. Code § 28-3901(b)(1).

70. The CPPA "establishes an enforceable right to truthful information from merchants about consumer goods and services," and it is to be "construed and applied liberally" to effectuate that purpose. D.C. Code § 28-3901(c).

71. In relevant part, the CPPA provides that: "[i]t shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby, including to:… (e) misrepresent as to a material

---

[11] *See* Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, supra n.4 (explaining that hidden junk fees therefore "impose substantial economic harms on consumers")

[12] *See e.g. Kahn v. Walmart Inc.*, 107 F.4th 585, 601 (7th Cir. 2024)("Bait-and-switch pricing schemes like the one alleged here lead to injuries that consumers cannot reasonably avoid, which come in the form of higher prices and search costs."(internal quotations omitted); Tom Blake et al., (2021) Price Salience and Product Choice. Marketing Science 40(4):619-636. https://doi.org/10.1287/mksc.2020.1261 (A peer reviewed industry study, finding that drip pricing "makes price comparisons difficult and results in consumers spending more than they would otherwise" and that "users who weren't shown the ticket fees upfront ended up spending about 20% more money and were 14% more likely to complete [the transaction].").

fact which has a tendency to mislead; (f) fail to state a material fact if such failure tends to mislead; (f-1) use innuendo or ambiguity as to a material fact, which has a tendency to mislead; (h) advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered." D.C. Code § 28-3904 (e), (f), (f-1), (h).

72. "[T]he basic fact that [a defendant's] advertised ticket price is different than the final purchase price charged to the consumer constitutes a prima facie assertion of misrepresentation under the CPPA." *District of Columbia v. StubHub, Inc.*, 2025 D.C. Super. LEXIS 4, 12 (D.C. 2025) (citing *Grayson v. AT&T Corp.*, 15 A.3d 219, 226 (D.C. 2011)).

**VIRGINIA ENACTED ONE OF THE NATION'S FIRST LAWS PROTECTING CONSUMERS FROM HIDDEN FEES**

73. On May 2, 2025, Virginia took aim at junk fees, enacting Senate Bill 1212, Virginia's All-In Pricing law. SB 1212, which became effective on July 1, 2025, is one of the first laws of its kind in the United States. The law prohibits the "advertise[ment] or display [of] a price for goods or services without clearly and conspicuously[13] displaying the total price, which shall include all mandatory fees or surcharges." Va. Code Ann. § 59.1-608(A). "Mandatory fees or surcharges" include any additional fee or surcharge that must be paid in order to purchase the good or service being advertised." Va. Code Ann. § 59.1-607. Mandatory fees or surcharges do not include "taxes or fees imposed on the consumer by a government or government-approved entity or assessment fees of a government-created special district or program paid to the government or government-approved entity." *Id.*

[13] "Clear and conspicuous" or "clearly and conspicuously" means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Va. Code Ann. § 59.1-607 (adopting definition from Va. Code Ann. § 59.1-207.45.).

74. Consumers injured by a violation of Virginia's All-In Pricing law are entitled to the same remedies as those afforded under the Virginia Consumer Protection Act, including statutory damages. Va. Code Ann. § 59.1-610.

75. Many states and the federal government have joined Virginia and banned drip pricing practices by sellers of goods and services, including ticket sellers. Yet, as discussed below, Defendant has engaged in a sustained campaign of drip pricing, in clear violation of Virginia law.

**DEFENDANT'S UNLAWFUL HIDDEN FEES**

76. Defendant's markup tactics operate uniformly across all ticket offerings on its website. Only after consumers have (1) selected a specific number of tickets, (2) for a specific route, (3) at a specific price, (4) for a specific date and time, are they confronted with Defendant's hidden fees.

77. As depicted in Figure 1 below, upon accessing the landing page of Defendant's website, users are prompted to select the arrival and destination of their trip, the number of passengers, dates of travel, and whether the itinerary will be one way or a roundtrip:



***Figure 1***[14]

78. After inputting trip information, consumers are then shown a list of departure times, their selected date and quoted a price for each ticket, as shown at Figure 2 below.




***Figure 2***

[14] The exemplar purchase flow is for a round-trip bus ticket from Washington, D.C. to New York, NY.

79. Next, consumers are prompted to select a return trip and are shown a list of departure times, their selected date and quoted a per seat price for each ticket, as shown in Figure 3:




***Figure 3***

80. Only after selecting tickets for a specific location, date, and time, being quoted a ticket price, choosing to buy based on that price, are users confronted with Defendant's hidden Facility Fee, Booking Fee and Fuel Surcharge as shown in Figure 4:




***Figure 4***

81. As shown in Figure 4 above, the total amount of hidden fees is $8.28 — a 23% markup from the listed ticket price.

82. Defendant's employment of hidden fees as discussed above was intentionally deceptive conduct designed to undermine consumer choice.

83. Complying with the District of Columbia and Virginia consumer protection laws is straightforward: a company like Defendant must display and advertise the price of its services that includes all mandatory fees. Defendant could have easily configured its website to list ticket prices inclusive of all mandatory fees. However, Defendant chose not to, precisely to take advantage of the fact that hiding the mandatory fees at the initial stages increases conversions from click-through browsing to ticket sales, even as it harms consumers, disadvantages compliant competitors, and is illegal.

## CLASS ACTION ALLEGATIONS

84. Plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated as a class action.

85. Plaintiffs Ross-Pilkington and Gonzalez seek to represent a Washington, DC Class defined as:

> All persons who while in the District of Columbia and within the applicable statutory period, up to and including the date of final judgment in this action, purchased a ticket on a ticketing website operated by Defendant where all mandatory fees were not included in the initially displayed or advertised price of the ticket.

86. Plaintiff Dittgen seeks to represent a Virginia Class defined as:

> All persons who while in the Commonwealth of Virginia and within the applicable statutory period, up to and including the date of final judgment in this action, purchased a ticket on a ticketing website operated by Defendant where all mandatory fees were not included in the initially displayed or advertised price of the ticket.

87. Plaintiff Dittgen also seeks to represent an All-In Pricing Subclass of the Virginia Class, defined as:

> All persons who while in the Commonwealth of Virginia, from July 1, 2025 up to and including the date of final judgment in this action, purchased a ticket on a ticketing website operated by Defendant where all mandatory fees were not included in the initially displayed or advertised price of the ticket.

88. Collectively, the Washington, D.C. Class and Virginia Class are referred to herein as "the Classes." Excluded from the Classes are Defendant, its corporate parents, subsidiaries, franchisees and affiliates, officers and directors, any entity in which Defendant has a controlling interest, and the legal representatives, successors or assigns of any such excluded person or entities. Additionally, excluded is the Judge or Magistrate Judge presiding over this action, their staffs, and their families.

89. Plaintiffs reserve the right to amend or modify the class description with greater specificity or further division into subclasses or limitation to particular issues based upon discovery or further investigation.

90. ***Numerosity.*** The members of the Classes are so numerous that joinder of all members is impracticable. While the exact number of class members is currently unknown to Plaintiffs, on information and belief the Classes are comprised of thousands of consumers in the District of Columbia and Virginia. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by postal or electronic mail and/or publication through the Defendant's sales records.

91. ***Commonality.*** Common questions of law and fact exist for all Class members and predominate over questions affecting only individual class members. Common legal and factual questions include, but are not limited to:

(a) Whether Defendant's conduct alleged above violated D.C. Code § 28-3901 et seq;

(b) Whether Defendant's conduct alleged above violated Va. Code Ann. § 59.1-608;

(c) Whether Defendant's conduct alleged above violated Va. Code Ann. § 59.1-196 *et seq*.

(d) Whether Plaintiffs and the members of the Classes are entitled to, and the amount of any, damages and/or restitution;

(e) Whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and

(f) Whether Plaintiffs and the members of the Classes are entitled to attorneys' fees and costs.

92. ***Typicality.*** Plaintiffs' claims are typical of the claims of the Classes in that Plaintiffs, like all proposed Class members, were exposed to Defendant's misrepresentations, purchased tickets on Defendant's website, and sustained damages from Defendant's uniform wrongful conduct, based upon Defendant's wrongful acts alleged herein.

93. ***Adequacy***. Plaintiffs will fairly and adequately protect the Class members' interests. Plaintiffs have no interest antagonistic to the Class members' interests, and Plaintiffs have retained counsel who has considerable experience and success in prosecuting complex class actions and consumer-protection cases.

94. ***Superiority***. The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

95. Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiffs and members of the Classes and will likely retain the benefits of its wrongdoing.

96. Based on the foregoing allegations, Plaintiffs' claims for relief include those set forth below.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of the D.C. Consumer Protection Procedures Act
### D.C. Code § 28-3901 et seq.

(*by Plaintiffs Ross-Pilkington and Gonzalez individually and on behalf of the Washington, D.C. Class*)

97. Plaintiffs Ross-Pilkington and Gonzalez re-allege and incorporate by reference paragraphs 1 through 96 above.

98. The CPPA protects consumers in the District of Columbia against false, deceptive, or unfair business practices and establishes an enforceable right to truthful information about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia. D.C. Code § 28-3901.

99. The bus tickets and other services that Defendant provides consumers are for personal, household, or family purposes and therefore are consumer goods and services. D.C. Code § 28-3901 (3)(A)(7).

100. Defendant, in the ordinary course of business, supplies consumer goods and services and therefore is a merchant under the CPPA. *Id.* at 3(A).

101. Plaintiffs and the Washington, D.C. Class members are consumers protected by the CPPA because they purchased tickets from Defendant as consumer goods. *Id.* at (2)(A).

102. Defendant, in connection with marketing, promoting, selling, and supplying its goods and services, has engaged in misleading and deceptive trade practices in violation of the CPPA, including by:

a. Advertising ticket prices that do not include Defendant's mandatory fees, in violation of D.C. Code § 28-3904(e);

b. Failing to adequately disclose material information to consumers concerning the true price of its tickets, in violation of D.C. Code § 28- 3904(f);

c. Failing to adequately disclose the amount of fees at the outset of the transaction, which constitutes an ambiguity as to material facts that have the tendency to mislead and is a deceptive trade practice, in violation of D.C. Code § 28-3904(f-1);

d. Advertising or offering goods or services without the intent to sell them at the advertised price, in violation of D.C. Code § 28-3904(h); and

e. Misrepresenting material facts concerning the total mandatory price of its tickets by advertising ticket prices that omitted mandatory fees; failing to state material facts concerning the total mandatory price; and using ambiguity regarding mandatory fees in a manner that had a tendency to mislead, in violation of D.C. Code § 28-3904(e), (f), and (f-1).

103. By the acts and omissions alleged herein, Defendant has engaged in deceptive and misleading acts and practices designed to sell tickets at prices higher than it advertised and promised to consumers, and to covertly and improperly squeeze additional money from its customers to boost its revenue.

104. By reason of this conduct, Defendant has engaged and continues to engage in deceptive acts and practices in violation of the Consumer Protection Procedures Act, D.C. Code § 28-3901 et seq.

105. Defendant's deceptive acts, misrepresentations, and omissions were and are material, in that they were likely to mislead reasonable consumers under the circumstances by falsely representing the ticket price.

106. Further, there is no countervailing benefit to consumers or competition from such practices; the practices serve only to increase Defendant's revenue.

107. As a direct and proximate result of Defendant's unfair and deceptive actions, Plaintiffs Ross-Pilkington, Gonzalez, and the Washington, D.C. Class members have been harmed and have lost money or property in the amount of the undisclosed mandatory fees that they paid to Defendant.

108. As a result of Defendant's unfair and deceptive actions and practices, Plaintiffs and the Washington, D.C. Class members have suffered damages and are entitled to recover actual damages, the greater of treble those damages or statutory damages in the amount of $1,500 per violation, punitive damages, and costs and attorneys' fees. D.C. Code § 28-3905(k)(2)(A)–(C).

**SECOND CLAIM FOR RELIEF**
**Violation of the VCPA, Va. Code Ann. § 59.1-196 *et seq*.**
(*by Plaintiff Dittgen individually and on behalf of the Virginia Class*)

109. Plaintiff Dittgen re-alleges and incorporates by reference paragraphs 1 through 96.

110. Plaintiff Dittgen and the members of the Virginia Class are "persons" within the meaning of Va. Code Ann. § 59.1-198.

111. Defendant is a "supplier" as defined by Va. Code Ann. § 59.1-198 because it is engaged in the business of advertising, selling, and offering for sale goods or services to consumers in the Commonwealth of Virginia.

112. Defendant's sale of bus tickets, provision of motorcoach services, and operation of an online booking platform service—which offers consumers greater convenience and assurance

than purchasing tickets at a physical ticketing office—constitute a "consumer transaction" under § 59.1-198 because they involve the advertisement and sale of goods or services for personal, family, or household purposes.

113. The VCPA is remedial legislation intended to "promote fair and ethical standards of dealings between suppliers and the consuming public." Va. Code Ann. § 59.1-197.

114. Defendant engaged in deceptive, misleading, and unfair acts and practices in violation of Va. Code Ann. § 59.1-200, including but not limited to: (1) Advertising tickets on its website with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised, in violation of § 59.1-200(A)(8) and (2) Using deception, false pretense, or misrepresentation in connection with a consumer transaction, in violation of § 59.1-200(A)(14).

115. Defendant advertised ticket prices that did not include all mandatory fees or surcharges. Defendant's online sales platforms displayed deceptively low prices throughout the purchase process while concealing mandatory fees that were only revealed after consumers had committed substantial time and effort to the transaction.

116. Defendant's omission of the mandatory fees was material, as the total price of tickets was a primary factor in consumers' purchasing decisions.

117. Defendant intentionally designed its sales process to mislead consumers by presenting lower initial prices and hiding the true, higher cost of tickets until the end of the checkout process to heighten purchasing pressure and reduce the likelihood that consumers would abandon the transaction after learning of the hidden fee.

118. Defendant's deceptive conduct had the tendency, capacity, and effect of misleading reasonable consumers and did in fact mislead Plaintiff Dittgen and members of the Virginia Class.

119. Plaintiff Dittgen and the Virginia Class were deceived and misled by Defendant's representations that the listed price was the full ticket price and were induced to purchase tickets and pay the hidden fees as a result.

120. Plaintiff Dittgen and the Virginia Class suffered ascertainable losses as a result of Defendant's unlawful conduct, including but not limited to the amount of the undisclosed and unlawful fees paid, the loss of the opportunity to make informed purchasing decisions, and the expenditure of additional time and cognitive effort caused by Defendant's deception.

121. Defendant's violations of the VCPA were willful, knowing, and intentional, as Defendant knew or should have known of its obligations to truthfully and accurately present the price of bus tickets under the VCPA and nonetheless continued to advertise and sell tickets using hidden-fee, drip-pricing tactics.

122. Pursuant to Va. Code Ann. § 59.1-204, Plaintiff Dittgen and the Class seek the greater of their actual damages or statutory damages of $500 per violation, or $1,000 per willful violation and reasonable attorneys' fees and costs.

123. Plaintiff Dittgen and the Class further seek equitable relief, including restitution and disgorgement of all unlawfully obtained monies, and such other relief as the Court deems just and proper.

## THIRD CLAIM FOR RELIEF
**Violation of Virginia's All-In Pricing Law, Va. Code Ann. § 59.1-608.**
*(by Plaintiff Dittgen individually and on behalf of the All-In Pricing Subclass)*

124. Plaintiff Dittgen re-alleges and incorporates by reference paragraphs 1 through 96 and paragraphs 111-112.

125. Plaintiff Dittgen and the members of the All-In Pricing Subclass are "persons," and Defendant is a "supplier" engaged in "consumer transactions" within the meaning of Va. Code Ann. § 59.1-198.

126. Defendant advertises and sells bus tickets to consumers in Virginia for personal, family, and household use.

127. Virginia's All-In Pricing Law, Va. Code Ann. § 59.1-608(A), prohibits any supplier, in connection with a consumer transaction, from "advertising or displaying a price for goods or services without clearly and conspicuously displaying the total price, which shall include all mandatory fees or surcharges."

128. "Mandatory fees or surcharges" include any additional amount that must be paid in order to purchase the advertised good or service and exclude only taxes or assessments imposed by a government or government-approved entity. Va. Code Ann. § 59.1-607.

129. Defendant violated § 59.1-608 by advertising and displaying ticket prices that did not include mandatory fees that consumers were required to pay in order to complete a ticket purchase.

130. At every step of Defendant's online purchase flow, consumers were shown ticket prices that appeared to be complete, yet Defendant added a mandatory fee, labeled as a "Booking Fee," "Facility Fee," and/or "Fuel Surcharge" that was only revealed after consumers had committed substantial time and effort to the transaction.

131. No portion of Defendant's hidden fees were imposed by any government or government-approved entity. The fees were entirely created and retained by Defendant for its own benefit.

132. Defendant's failure to include mandatory fees in its displayed prices rendered its price advertisements false, misleading, and deceptive, and deprived consumers of the ability to compare true prices or make informed purchasing decisions.

133. Defendant's unlawful omission was material and caused injury to Plaintiff Dittgen and the All-In Pricing Subclass, including: payment of unlawful, undisclosed fees, loss of the opportunity to make informed purchasing choices; and time and effort wasted navigating Defendant's misleading checkout process.

134. Pursuant to Va. Code Ann. § 59.1-610, a violation of § 59.1-608 constitutes a prohibited practice under the Virginia Consumer Protection Act and is subject to all enforcement provisions and remedies provided by Va. Code Ann. §§ 59.1-196 et seq.

135. Defendant's violations were willful and knowing. Defendant knew or should have known of Virginia's All-In Pricing requirements, which took effect July 1, 2025, yet continued to use drip-pricing tactics and hidden fees designed to mislead consumers and inflate profits.

136. As a direct and proximate result of Defendant's conduct, Plaintiff Dittgen and the subclass suffered ascertainable losses and seek: Restitution and disgorgement of unlawfully obtained monies; the greater of actual damages or statutory damages of $500 per violation, or $1,000 per willful violation, under §§ 59.1-610 and 59.1-204; and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes pray for relief and judgment as follows:

A. For an order certifying this case as a class action and appointing Plaintiffs' counsel as Class Counsel;

B. For an order finding in favor of Plaintiffs and the Classes on all claims alleged herein;

C. For actual or statutory damages in amounts allowed by law and/or to be determined by the Court and/or jury;

D. For prejudgment interest on all amounts awarded;

E. For an order of restitution and all other forms of equitable monetary relief appropriate by statute;

F. For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees, expenses, and costs of suit as appropriate by statute; and

G. For an order awarding such other equitable or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all claims and issues so triable.

Dated: May 5, 2026

Respectfully Submitted,

**RAVINDRAN LAW FIRM, PLLC**

By: *__/s/ Arun G. Ravindran*

Arun G. Ravindran
2525 Ponce de Leon Blvd., Suite 300
Coral Gables, FL 33134
Telephone: (305) 677-8713
E-Mail: arun@ravindranlaw.com

*Counsel for Plaintiff and the Putative Classes*